MARILYN BUNCH, an Infant by ELMER LOREN BUNCH, her Next Friend, Appellant, v. ERWIN MUELLER, Respondent, No. 45057—284 S. W. (2d) 441.

Court en Banc, November 14, 1955.
Rehearing Denied, December 12, 1955.

*Lyng, MacLeod & Davidson, Russell N. MacLeod* and *F. Daley Abels* for appellant.

*Jones, Hocker, Gladney & Grand, Harold C. Gaebe, Jr.,* and *Harold B. Bamburg* for respondent.

[441] DALTON, J.—Action for damages for personal injuries sustained by plaintiff, a ten year old [442] child, when she was struck by defendant's automobile as she was crossing a public street in the city of St. Louis. The cause was submitted on defendant's alleged humanitarian negligence in failing to stop or warn. Verdict and judgment were for defendant and plaintiff appealed. Since the amount sued for was $5,000, the appeal was taken to the St. Louis Court of Appeals, where that court would have affirmed the judgment [Bunch v. Mueller (Mo. App.), 278 S.W. 2d 25], but on application of plaintiff-appellant the cause has been transferred to this court. We shall review the record as if on original appeal to this court. Art. V, Sec. 10, Const. of Mo. 1945.

Plaintiff-appellant contends that the court erred in giving Instruction No. 5, on sole cause, at the request of defendant. Defendant-respondent, however, insists (1) that the instruction correctly declares the law; (2) that, in any event, it was not prejudicially erroneous; and (3) that, even if the instruction is erroneous, the error is immaterial because the plaintiff-appellant failed to make a submissible case of humanitarian negligence for the jury on the grounds submitted. Respondent says there was "no evidence to show where the defendant was at the time the plaintiff first came into a position of imminent peril." If plaintiff failed to make a case for the jury, the error, if any, in the giving of Instruction No. 5 was harmless and immaterial. O'Dell v. Dean, 356 Mo. 861, 204 S.W. 2d 248; Coleman v. Ziegler (Mo. Sup.), 248 S.W. 2d 610, 617. Accordingly, we must determine whether plaintiff made a case for the jury on the grounds submitted.

■■ The evidence favorable to plaintiff tended to show that on September 19, 1952, plaintiff was residing with her parents at 4158 McRee Street in the city of St. Louis. About 5 p.m. in the afternoon of that day, she started to go to a drug store south of Lafayette Avenue to get a paper for her mother. Lafayette is 30 to 35 feet in width and runs east and west. It intersects, at right angles, Tower Grove Avenue which is 50 to 55 feet in width. The intersection was marked for ''a four-way stop.'' There were four lines of traffic, two each way on Tower Grove, and two lines of traffic, one each way on Lafayette. Plaintiff was walking south on the east side of Tower Grove. She stepped off the sidewalk into Lafayette to cross it at the corner and she walked straight across from the sidewalk. While on the curb, she looked both right and left before she started to cross and she saw no automobile approaching that would interfere with her crossing. She then started walking south and ''never did run.'' When she reached the center of Lafayette she looked again to her right and saw ''nothing coming.'' She continued walking south, until she was struck and knocked down by defendant's eastbound automobile. The front part of the automobile, the radiator, hit her. The automobile came from her right. She never saw it, until it struck her. She was knocked down and fell in the street in front of the automobile. After she was down and the automobile had been stopped, it was so close to her she could touch it. Her evidence does not otherwise show how far she had walked beyond the center of Lafayette, nor how far she was moved eastwardly from her original position by the impact of the automobile. The skin of her right hip was broken and the hip was bruised. Both knees were cut and plaintiff suffered other injuries.

There was evidence that, shortly after the collision, defendant told two police officers that, as he reached the crosswalk, the child started crossing the street from north to south; that the child ''walked in front of'' his automobile; that he saw her when she was about 10 feet ahead; that he didn't see her until he struck her; that the front bumper of his automobile struck her; that, at the instant of the collision, he was traveling about 10 miles per hour; and that he had not exceeded 15 miles per hour in crossing Tower Grove.

Plaintiff also offered parts of defendant's prior deposition testimony to the effect that he was going east on the south side of Lafayette; that he had had to creep through the traffic on Tower Grove; that his maximum speed was 5 or 8 miles per hour; that plaintiff was on his (south side) of [443] Lafayette, when he saw her; that he was looking straight ahead, when he saw her; that he didn't see anyone crossing Lafayette before he saw plaintiff; that he had looked to the left before he reached the crosswalk and saw no one crossing the street; and that the range of his vision included the crosswalk to his left.

Defendant's testimony favorable to plaintiff at the trial tended to show that there was very heavy traffic in each of the four lanes of

traffic on Tower Grove; that he had had to inch his way across; that he had to stop and start, and to hesitate and then go a little farther; that he had had to stop and let automobiles pass in front of him in each of the two northbound lanes (east lanes) on Tower Grove; that, when the traffic cleared in the furtherest east lane, he looked to his left, looked at the crosswalk, and saw no one; that he never saw plaintiff, until she was crossing the center line of Lafayette and coming into his side of the street; that she must have passed in front of a westbound automobile on Lafayette, "as she appeared right out of nowhere in front of" him; that he saw her "just as she bumped into" him and "diagonally cut across in front of" him; that his speed, after the last northbound cars on Tower Grove had passed in front of him, did not exceed 5-8 miles per hour, but that it could have been 2 or 3 miles per hour; that his speed during the first 5 feet did not exceed 2 miles per hour; that at 5 miles per hour, he could have stopped in one foot, including reaction time, and in about 1½ feet at 8 miles per hour; that at no time did he sound his horn; that, after the last northbound car had passed in front of him on Tower Grove, there was nothing to obstruct his view of the crosswalk across Lafayette; that, when he started up after the last car had passed, he was more than 10 feet west of the east line of Tower Grove; that his automobile was in good condition and the streets dry and level; and that, when he saw plaintiff, he stepped on the brakes and "stopped dead" and there were no skid marks.

Other evidence favorable to plaintiff included a part of the testimony of defendant's witnesses, Mr. and Mrs. Jacques. They both saw the plaintiff cross the north half of Lafayette going south. She crossed in front of their westbound automobile. She looked only to the east. There was nothing between plaintiff and the defendant's automobile (as the defendant was coming east through the east line of northbound traffic on Tower Grove) to have prevented defendant from seeing the plaintiff as she moved across Lafayette to the point of collision.

Plaintiff offered no direct testimony as to how fast she walked in crossing Lafayette to the point of collision. She said she did not run and her evidence indicates that she was proceeding in the usual and ordinary manner of a child of her age. No reasons for haste or delay appear. In such case the rate at which she traveled was a matter of common knowledge. Jurors are presumed to know of such matters. "This court has taken judicial notice of the fact that the ordinary walking speed of the average man is two or three miles per hour or 2.9 to 4.4 feet per second." DeLay v. Ward, 364 Mo. 431, 262 S.W. 2d 628, 635, and cases cited. A ten year old child would walk at approximately the same speed. Further, her testimony tends to show she had reached the approximate center of the eastbound traffic lane in the south half of Lafayette, and that she was oblivious of her peril when she was

struck by the radiator of defendant's automobile. The distance of defendant's automobile from plaintiff's line of travel at any particular time, as plaintiff moved across Lafayette, was a mere matter of computation by the jury, dependent upon what speed the jury might believe and find the plaintiff to have been walking and the defendant to have been traveling as he moved from his stopped position in Tower Grove to the point of collision. Where plaintiff was when she came into a position of imminent peril of being struck by defendant's automobile was a fact question for the jury to determine under all of the circumstances in evidence. Wofford v. St. Louis Public Service Co. (Mo. Sup.), 252 S.W. 2d 529, 533; Kelley v. St. Louis [444] Public Service Co. (Mo. Sup.), 248 S.W. 2d 597, 601.

In view of the evidence in the record as to the speed at which defendant operated his automobile and the distance within which he could stop it at stated speeds, it is clear that there was evidence from which a jury could find that, after plaintiff came into a position of definite and certain peril from the approach of defendant's automobile, the defendant was a sufficient distance away from her, and from her line of travel, that he could have stopped his automobile or sounded a warning and have avoided striking and injuring her. The jury could find that plaintiff had stepped off the sidewalk at the north curb of Lafayette and had walked directly south along a proper crossing at a speed of 2 to 3 miles per hour; that she traveled some 18 to 20 feet in Lafayette and, after she had passed the center of Lafayette, she was struck and knocked down by the front bumper and radiator of defendant's automobile; that at 2.9 to 4.4 feet per second it took her some 4 to 7 seconds to walk from the north curb of Lafayette to the point of collision; that the front of defendant's automobile had moved from a stopped position west of the easternmost northbound traffic lane on Tower Grove to the point of collision at from 2 to 3 or 5 to 8 miles per hour; that his speed did not exceed 2.9 feet per second during the first 5 feet; that it took defendant some 3 or more seconds to move from his stopped position to the point of collision; that during all of such time there was nothing to obstruct defendant's view of plaintiff and her movements; that defendant could have stopped his automobile within a foot to a foot and a half, including reaction time; and that he neither stopped, nor sounded a warning, but drove his automobile directly into and against the plaintiff. The court did not err in refusing to direct a verdict for defendant. See DeLay v. Ward, supra, 262 S.W. 2d 628, 634; Anderson v. Prugh, 364 Mo. 557, 264 S.W. 2d 358, 363.

Appellant contends that the court erred in giving Instruction No. 5, "for the reason (a) that the factual situation precluded a sole cause defense; and (b) that as a result thereof the instruction did not and could not hypothesize a set of facts justifying a sole cause defense." Of course there must be facts in evidence which will sustain

a sole cause defense before a defendant may properly have a sole cause instruction. Johnson v. Cox (Mo. Sup.), 262 S.W. 2d 13, 16; Bootee v. K. C. Public Service Co., 353 Mo. 716, 183 S.W. 2d 892, 896; Long v. Mild, 347 Mo. 1002, 149 S.W. 2d 853, 860. In other words, the evidence must be such that the sole cause instruction may hypothesize a sufficient state of facts and circumstances to necessarily exclude the defendant's humanitarian negligence as a possible concurring cause of plaintiff's injury by demonstrating that defendant was free from such negligence and showing that plaintiff's conduct was the sole cause.

Instruction No. 5 is as follows: "The Court instructs the jury that if you find and believe from the evidence that the plaintiff, Marilyn Bunch, while crossing Lafayette Avenue near its intersection with Tower Grove Avenue from the north curb to the south curb of said Lafayette Avenue, looked only toward her left, that is to say, east on Lafayette Avenue, and that plaintiff failed to look to her right, if you so find, and in so failing she was negligent, and thereupon plaintiff suddenly and unexpectedly ran from the north curb of Lafayette Avenue toward and directly into the path of defendant's automobile, and that in so running she was negligent, and that such failure, if any, to look toward her right before plaintiff suddenly and unexpectedly ran into the path of defendant's automobile, if you so find, was the sole cause of the collision; and if you further find that when plaintiff came into a position of imminent peril of being struck by defendant's automobile, the automobile of defendant was then so close to plaintiff that in the exercise of the highest degree of care defendant could not have avoided the collision by stopping said automobile, or giving a signal or warning of his proximity and approach, if you so find, then and in that [445] event you are instructed that the defendant was not guilty of any negligence, and your verdict should be in favor of defendant, Erwin Mueller."

In determining the sufficiency of the evidence to sustain the giving of the instruction we must consider the evidence favorably to defendant. Bootee v. K. C. Public Service Co., supra, 183 S.W. 2d 892, 896; Rothe v. Hull, 352 Mo. 926, 180 S.W. 2d 7, 9; Ferguson v. Betterton, 364 Mo. 997, 270 S.W. 2d 761.

In addition to defendant's testimony, hereinbefore reviewed, defendant testified that, when the front of his automobile was about 8 feet clear of the intersection, he saw the plaintiff for the first time near the center line of Lafayette apparently running diagonally across the street toward the path of his automobile. At that time he was going at a speed of from 5 to 8 miles an hour. He applied his brakes at once and his automobile was stopped almost immediately. Plaintiff ran into the left front fender of his automobile after it was stopped, but her momentum carried her forward and she fell down on both knees in front of his left headlight. He also said that the front of his automobile was about 8 feet east of the crosswalk on Lafayette when the

collision occurred. Defendant said he was driving south of the center line of Lafayette. Automobiles were parked on each side of the street. He had about one foot of clearance on the right and not over 2½ on the left between him and an approaching automobile.

Defendant's witnesses, Jacques and wife, who were in the automobile going west on the north side of Lafayette testified that there were cars parked on the north side of the street; and that the automobile in which they ware riding was being brought to a stop, in compliance with the stop sign at the intersection, when Mrs. Jacques noticed plaintiff and directed her husband's attention to her. He stopped his automobile and the plaintiff put her head down and ran across the street. He said that the defendant's automobile stopped immediately and that the plaintiff threw out her hands against the hood of defendant's automobile and fell to a sitting position in front of it. One of these witnesses said plaintiff was in front of and at the edge of a car parked at the north curb, the other said plaintiff was standing in the street on the north side of Lafayette, "just down from the curb," in front of a parked car; and that plaintiff looked east, but not west, and "put her head down and darted across the street." The front of the car parked at the north curb was at the stop sign on Lafayette, which sign was 12 or 14 feet east of the east edge of Tower Grove. There was testimony that plaintiff ran from the north curb to a point beyond the center of the street where the collision occurred. On the basis of the testimony of defendant's witnesses, plaintiff ran some 18 feet or more to the point of collision. Defendant's Instruction No. 5, as indicated, submitted that plaintiff "ran from the north curb of Lafayette Avenue toward and directly into the path of defendant's automobile." Defendant offered no evidence tending to show that plaintiff walked to the center of Lafayette apparently conscious of the approach of his automobile and then suddenly darted against or in front of his automobile, nor did defendant's evidence fix the speed at which plaintiff ran, but we think the jury, within limits, could determine that issue of fact as a matter of common knowledge at around 5 or 6 miles per hour. The speed indicated would be 7.3 to 8.8 feet per second. If plaintiff ran diagonally, as defendant and his witnesses testified, it would have taken her two seconds or more to move from the north curb to the point of collision.

Since there was a collision, it is apparent that defendant was also approaching the point of collision. Defendant said he moved forward (from a complete stop at a point about one foot west of the easternmost northbound lane on Tower Grove) some 10 feet from the east curbline of Tower Grove to the point of collision, which he said was 8 feet beyond the crosswalk on Lafayette. While defendant repeatedly referred to the crosswalk on Lafayette, he at no time indicated its [446] width, nor did any other witness. However, the stop sign, as stated, was 12 or 14 feet east of the east line of Tower Grove. De-

fendant said that at the end of the first 5 feet his speed was less than 2 miles per hour; and that his highest speed was 5-8 miles per hour before the collision. On the basis of defendant's evidence defendant moved 18 feet (exclusive of the width of the crosswalk) at an increasing speed from 2 to 8 miles per hour to the point of collision. During this time, defendant and his witnesses agree that there was nothing to obstruct defendant's view to his left from the curb to the center of the street, where defendant first saw the plaintiff. At 2 miles per hour, defendant was moving 2.9 feet per second, at 5 miles per hour 7.3 feet per second and at 8 miles per hour, he would have moved 11.7 feet per second. It is apparent that defendant was in excess of 20 feet away, when plaintiff started to run. Further, defendant's evidence is that plaintiff was apparently oblivious, since she only looked to her left.

We think that a consideration of all the evidence favorable to defendant fails to show a sole cause situation for the reason that, if we assume the truth of all of the evidence favorable to defendant, the facts established do not exclude defendant's negligence as a possible concurring cause of plaintiff's injuries, nor establish as a matter of law that defendant was not negligent as charged and submitted under the humanitarian doctrine in failing to stop or warn after the plaintiff came into imminent peril. The matter of when plaintiff came into a position of imminent peril and whether defendant, thereafter, could have avoided striking her by stopping or warning were the issues which should have been submitted to the jury. Plaintiff made a submissible case on those issues and defendant's evidence did not show that plaintiff appeared suddenly and in close proximity to defendant's automobile from a place where she could not have been seen. Instead, his evidence shows that she came from a place in full view of defendant, and had crossed more than half of the street to reach the point of collision. His view, as he approached, was unobstructed. Therefore, the only issues were whether defendant could have avoided a collision by stopping or warning, after plaintiff came into a position of imminent peril from his approaching automobile. The giving of Instruction No. 5, constituted prejudicial error.

In view of the conclusions reached, we do not reach appellant's further contention that Instruction No. 5 is erroneous "for the reason that it failed to negate defendant's negligence," and in that "no facts were hypothesized from which the jury could find defendant not guilty of the negligence submitted by plaintiff," nor do we reach appellant's contention that "the instruction was misleading and self-contradictory" and misled the jury into considering plaintiff's antecedent negligence. Clearly, the instruction is not in an approved form and it unnecessarily submitted to the jury a required finding that the acts of plaintiff relied upon by defendant as constituting sole cause were in

fact negligent acts, although such characterization and finding was unnecessary to a sole cause defense.

Whether or not the instruction, if it had been based upon substantial evidence, would have constituted reversible error in view of the particular facts and circumstances and other instructions in this case is a matter we need not determine.

For the error in giving Instruction No. 5 in the absence of substantial evidence to sustain a sole cause submission, the judgment is reversed and the cause remanded. All concur.